## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

SANDRA VALDEZ HERNANDEZ,
as parent of J.V., a minor child,

       Plaintiff,

    v.                             CIVIL NO. 13cv00939 WJ-WPL

BOARD OF EDUCATION OF ALBUQUERQUE
PUBLIC SCHOOLS,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## UPHOLDING HEARING OFFICER'S FINAL DECISION ON IDEA APPEAL

This case was filed by Plaintiff ( or "Parent") on behalf of her son J.V., a student in the Albuquerque Public Schools ("APS") following an administrative due process hearing request under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(i)(3)(A).   J.V. has a medical diagnosis of Down Syndrome and a hearing impairment.  The IDEA due process Hearing Officer ruled against the Parent and in favor of the school district. Parent now seeks judicial review of the administrative due process Hearing Officer's final decision pursuant to 20 U.S.C. §1415(i)(2)(A). Plaintiff also claims that the school district has discriminated against her son based on disability in its failure and refusal to meet his unique communication needs as a student with hearing impairment.

Plaintiff's lawsuit is both an IDEA civil action, following an administrative due process hearing, which challenges APS's delivery of special education to J.V; and an independent action seeking remedy for discrimination on the basis of disability (Title II of the ADA and Section 504 of the Rehabilitation Act) on behalf of her minor son, J.V.   The Court will consider the merits of

Plaintiff's discrimination claims separately, when addressing Defendant's Motion for Judgment on those claims, which is pending before the Court.

In this Memorandum Opinion and Order, the Court considers whether to reverse the Final Decision by the due process Hearing Officer, as Plaintiff seeks, or to grant the relief sought by APS, which is to enter judgment against Plaintiff on her IDEA claims.  Based on the Court's review of the parties' IDEA trial briefs (Docs. 24 and 34), the Record Proper  (lodged with the court on September 16, 2014), and the due process hearing Transcript (hereinafter, "Tr."), the Court finds that Plaintiff's appeal shall be denied and that the Hearing Officer's Final Decision on all IDEA matters shall be upheld.

## BACKGROUND

This lawsuit centers on Plaintiff's claims that APS did not adequately address her son's hearing impairment and the effect it has on his learning environment.[1]

### I.    Parties' Positions

Plaintiff contends that J.V.'s ability to access public education is impacted by his hearing impairment, and that he been unable, despite speech therapy, to develop meaningful spoken language.  Plaintiff contends that APS has failed and refused to supply necessary special education and services to meet his needs as a student with hearing impairment. This failure includes instruction and immersion in American Sign Language ("ASL").

For his entire education, J.V. has been identified as a student with an intellectual disability because he has Down Syndrome.  During the 2011-12 school year, J.V. was an 8th

---

[1]    Federal regulation provides separate definitions for "hearing impairment" and "deafness," with "hearing impairment" used as the umbrella term.  see 34 C.F.R. §300.8(c)(3),(5). The State of New Mexico uses the term, "hard-of-hearing." *See* Deaf and Hard-of-Hearing Children's Educational Bill of Rights, NMSA 28-11C-1 et seq. The Court uses the term "hearing impairment" to refer to both the IDEA definitions and those covered by the New Mexico Bill of Educational Rights.

grade student at Hayes Middle School and Kennedy Middle School.  In the 2012-13 school year, he was a 9th grade student at Manzano High School.  APS has always placed J.V. in its "intensive support program ("ISP") classrooms including his 8th and 9th grade school years.  The ISP classrooms are self-contained classrooms serving multiple intellectually disabled students.  Final Decision at 4 (RP Tab 19).   APS audiological testing describes J.V.'s hearing loss as:

> consistent with a mild to moderate, primarily sensorinerual [sic] hearing loss in both ears through the speech frequencies. . . . With this amount of hearing loss, it is expected [J.V.] will have difficulties hearing normal conversational level speech, especially in the presence of background noise, such as a classroom.

Exh. TT at p. 1. (emphasis added).[2]  J.V.'s hearing loss has been "consistently described as mild to moderate, fluctuating in degree depending on the status of his middle ear.   . . . It has always been recognized as educationally significant. . . .").  Final Decision at 7 (RP Tab 19), and Finding of Fact ("FOF") # 3.   Plaintiff asserts that for portions of the school day for the last three years, J.V. has been unable to hear and understand the conversation of teachers, staff and classmates in his school setting.  Plaintiff contends that this should have been remedied by instructing and immersing J.V. in American Sign Language ("ASL"), which does not rely on J.V.'s ability to hear for receptive or expressive language.    Plaintiff objects to her son's placement in ISP classrooms where his exposure to ASL has been limited, and contends that instead, he should have been placed in classrooms where ASL was used by staff and students.  Plaintiff also cites to APS's lack of a sufficient number of teachers knowledgeable in the field of deaf education, fluent in ASL and otherwise qualified to provide instruction to students who are

---

[2]  Joint Exhibits are lettered AA to ZZ; Petitioner's Exhibits are numbered 1 to 37; and Respondent's Exhibits are lettered A to P.  Where feasible, the Court omits references in the briefs to the Record Proper ("RP") or the Transcript of the due process hearing ("Tr.") for ease of reading.

deaf/hearing impaired, pointing to deposition testimony indicating that New Mexico has no university which provides a degree in deaf education, and no required licensure for a teacher of the deaf/hearing impaired other than the requirements for teachers who work with students in special education.  Tr., vol. III at 677-78; vol. V at 1259-1260.

Defendant APS contends that J.V. has not been denied access to education under the IDEA because his hearing impairment has always been considered when developing his Individualized Education Program ("IEP") and when deciding what placement best fit his educational needs under the IDEA.  Defendant also claims that APS did not discriminate against J.V. on the basis of his disability, which the Court will address separately in Defendant's Motion for Judgment on Plaintiff's Claims of Discrimination (Doc. 27).

In April 2013, Plaintiff filed a request for an IDEA due process hearing on behalf of her son, J.V. against APS, the local educational agency ("LEA"), asserting a deprivation of her son's right to a free and appropriate public education for the school years 2011-12 (8th grade) and 2012-13 (first year of high school).  The hearing was held over a five-day period in July 2013, and the Due Process Hearing Officer ("DPHO") issued a Final Decision on August 27, 2013, finding in favor of APS and against Plaintiff.  Plaintiff timely filed this civil action challenging that decision on September 26, 2013.  *See* 20 U.S.C. §1415(i)(2)(A)(B).  In her Final Decision (Tab 19, Record Proper), the DPHO found that APS has appropriately addressed J.V.'s individualized needs arising from his intellectual disability and his hearing loss and concluded that J.V. has made appropriate progress in accord with his abilities.  The DPHO rejected Plaintiff's argument that labeling J.V. differently or providing different support for hearing loss would allow him to overcome his intellectual disability to improve academic progress.  Instead, the DPHO concluded in part that that Plaintiff failed to prove by a preponderance of the evidence

that J.V. is a child with a hearing impairment, as defined under the IDEA; that APS was required to address deaf education considerations found in the IDEA and/or state law; and that APS was not required to have deaf education-related personnel at J.V.'s IEP meetings.   Record Proper ("RP"), Tab 19 at 20-21.

## II.    Legal Standard

The IDEA requires that states establish a goal of providing full educational opportunity to all children with disabilities.  *See* 20 U.S.C. §1412(a)(2); *Ellenberg v. New Mexico Military Institute*, 478 F.3d 1262, 1275 (10th Cir. 2007).   The IDEA guarantees that children with disabilities have access to "a free and  appropriate public education which emphasizes special education and related services designed to meet their unique needs . . . ."  20 U.S.C. §1400(c). To meet this goal, the IDEA provides federal funding to state and local agencies and requires them to provide each child with an IEP, which is a written statement that includes such matters as the child's level of educational performance, annual goals, services to be provided to the child and the like. See 20 U.S.C. §1414(d).

The term "free appropriate public education" ("FAPE") means special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency ("SEA"); (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education programs required under section 1414(d) of [IDEA]. 20 U.S.C. §1401(8); 34 C.F.R. § 300.13.  States are required to provide a handicapped child with FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982).   Parents have the right to seek review of

any decisions affecting their child's education through a due process hearing conducted by the SEA.  See 20 U.S.C. §1415(f)(1); *Honig v. Doe*, 484 U.S. 305, 311-12 (1988); *T.S. v. Indep. Sch. Distr. No. 54*, 265 F.3d 1090, 1091 (10th Cir. 2001).

Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified de novo standard when reviewing agency disposition in the IDEA context. See 20 U.S.C. § 1415(i)(2)(C); *Garcia v. Board of Educ. of Albuquerque Public Schools*, 520 F.3d 1116, 1125 (10th Cir. 2008) (citing *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir.1995)).  Although unique, the modified de novo standard of review nonetheless comports with the Tenth Circuit's general deference to an administrative tribunal as to findings of fact turning on the credibility of evidence.  *See Adams ex rel. D.J.W. v. Astrue*, 659 F.3d 1297, 1302 (10th Cir. 2011) (noting that credibility determinations are "peculiarly the province of the finder of fact" and are upheld "when supported by substantial evidence" in the record, provided that the determinations are "closely and affirmatively linked" to that evidence) (reviewing administrative hearing under SSI).   Specifically, the district court must (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of evidence.  20 U.S.C. §1415(i)(2)(C).  At the same time, though the statute specifies that review is de novo, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that "due weight" must be given to the administrative proceedings, the fact findings of which are "considered prima facie correct." *Bd. of Educ. v. Rowley*, 458 U.S. at176; *Garcia,* 520 F.3d at 1125 (citing *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir.2004)).

The IDEA defines "hearing impairment" as an "impairment in hearing, whether permanent or fluctuating, that adversely affects a child's educational performance but that is not included under the definition of deafness. . . ." 34 C.F.R. §300.8(c)(5).   Plaintiff contends that because APS has adopted and/or applied a much narrower definition of hearing impairment, APS has failed to properly consider her son for inclusion under the IDEA as having a "hearing impairment" so that he can receive special education as a deaf or hearing impaired student.   She contends that the lack of such services is to blame for her son's developmental delay in communication skills.

## DISCUSSION

Plaintiff raises specific areas of challenge to the DPHO's Final Decision, claiming that APS denied J.V.  a FAPE by: (1) failing to identify his Hearing Impairment eligibility; (2) failing to undertake  the mandatory "special considerations" which are contained in the Addendum form created by the New Mexico State Education New Mexico Public Education Department; (3) failing to consistently implement the FM system; and (4) failing to consider and/or provide ASL instruction in an ASL immersion environment.   The Court's findings and conclusions herein address the specific challenges raised by Plaintiff to the Hearing Officer's Conclusions of Law ("COL"), which Plaintiff has included by reference in her brief under each of the issues raised. The Final Decision is located at Tab 19 of the Record Proper.[3]

Because the parties approach these issues somewhat differently, the Court groups the issues so as to avoid repetition.

**I.	Whether J.V. was denied a FAPE by APS's failure to identify his eligibility for services as a hearing impairment individual under the IDEA**

---

[3]   For example, in the IDEA brief, Plaintiff refers to the Hearing Officer's FOF 3 and COL 6 as part of Issue 1 (Doc. 24 at 10; COL 8, 10, 11, 12, 13, 15, 18 and 19 for Issue 2 (Doc. 24 at 11); COL 15, 17, 18 and 19 for Issue 3 (Doc. 24 at 11-12); and COL 7, 13 and 15 for Issue 4 (Doc. 24 at 12).

Plaintiff contends that J.V. should have received special education under the deaf/hearing impaired category.   The DPHO found that Plaintiff (designated as "Parent" in the DPHO's Findings of Fact and Conclusions of Law):

> failed to prove that Student's hearing loss rose to the level of a disability recognized under the IDEA.  Hence, the requirement to consider special factors for deaf or hard of hearing was not triggered . . . the record as a whole demonstrates that consideration of Student's communication needs which are believed to be primarily, if not wholly, the result of Student's cognitive deficits, was central to District's educational planning for Student.

Final Decision at 14 (RP, Tab 19).   Plaintiff claims that the DPHO's conclusion is at odds with J.V.'s hearing loss, contending that J.V. should have been assessed as a "hearing impaired" student and that his cognitive impairments do not prevent a hearing impaired individual from learning ASL.   Defendant argues that J.V.'s eligibility "label" does not drive his placement, and that Plaintiff disregards the determinative question of whether J.V.'s education program was appropriate.   While J.V.'s cognitive impairment does not *prevent* him from learning ASL, learning ASL does not necessarily mean that J.V.'s communication skills will improve, particularly if J.V.'s communication delay stems from his intellectual deficits.

Plaintiff asserts that APS missed the boat by ignoring APS's failure to identify J.V. as "hearing impaired" under IDEA eligibility criteria, Doc. 37 at 2-3, but offers no legal basis to overturn the HO's conclusion.   Plaintiff ignores the requirements underlying the eligibility process under the IDEA which involves identification and evaluation, the purpose of which is to develop a student's individualized education plan.  20 USC §1414(d)(1)(B) and (d)(3)(A).  This process is the same, whether a student has a hearing impairment or an intellectual disability:

> [t]he process for determining the educational placement for children with low-incidence disabilities (including children who are deaf, hard of hearing, or deaf-blind) is the same process used for determining the educational placement for all children with disabilities. That is, each child's educational placement must be determined on an individual case-by case basis depending on each child's unique

educational needs and circumstances, rather than by the child's category of disability.

71 Fed. Reg. 46,586 (2006) [emphasis added]. Determination of eligibility for a disability, as defined under the IDEA, requires a consideration of all relevant information, based on a myriad of factors on several levels by a group of qualified professions. Such consideration envisions the "completion of the administration of assessments and other evaluation measures," and is based on procedures which utilize evaluation data that comes from many different sources such as aptitude and achievement tests, parent and teach input, social or cultural background, and adaptive behavior. *See* 34 CFR §300.306(a)-(c).[4] Instead, without having offered any expert testimony to challenge the IEP team's interpretation of the audiological test results, Plaintiff simply assumes that because audiological testing shows some hearing loss, J.V. meets IDEA criteria for a "hearing impaired" student.

Plaintiff insists that mislabeling a student *does* matter under the IDEA, relying on *Bell v. Bd. of Education of APS,* 2008 WL 5991062 (D.N.M. 2008). Plaintiff claims that *Bell* rejected the same arguments that are advanced here by APS, but this is not an accurate representation of the court's reasoning in that case, because the court in *Bell* actually agreed with APS' general position:

> APS is correct in arguing that an incorrect identification will not lead to a denial of a FAPE if the student's IEP nonetheless provides for educational programming appropriately tailored to the student's unique needs.

*Bell v. Bd. of Educ.*, 2008 WL 5991062, at *27 (D.N.M., 2008). The court also noted that "[l]abels are not determinative." *Id.* It was the particular fact pattern in *Bell* which convinced

---

[4]   Determination of eligibility for a disability, as defined under the IDEA, requires consideration of a myriad of factors on many levels by a group of qualified professions, upon "completion of the administration of assessments and other evaluation measures"; and is based on procedures which utilize evaluation data that comes from many different sources such as aptitude and achievement tests, parent and teach input, social or cultural background, and adaptive behavior.

the court that "Bell's situation was one in which the incorrect label turned out to be important." *Id.* The student in *Bell* had been identified as "learning disabled" rather than "mentally retarded," and the court found it "unconvincing" that a school district would design the same IEP for students in both categories. *Id.* at *27. Bell's IEP was changed when his eligibility was changed, and thus he began receiving services which he did not receive before.

No such facts are present here. Plaintiff does not claim that J.V. was *mis*labeled or found eligible under the *wrong* disability; and his hearing impairment was taken into account when APS developed his IEP's. Thus, in this case, the real issue is not whether J.V. meets the eligibility criteria as a "hearing impaired" student, but the real issue is whether IDEA's objectives were met and whether APS determined appropriate placement and educational services for J.V. *See Heather S. v. Wisconsin,* 125 F.3d 1045, 1055 (7th Cir. 1997) (where parents complained that the student's programming must be deficient because some school staff wrongfully identified the student as "cognitively disabled," the court concluded that the IDEA "concerns itself not with labels, but with whether a student is receiving [FAPE]").

The Court finds no legal error in the DPHO's conclusion that Plaintiff failed to prove that J.V. should have been categorized as "hearing impaired" as defined in the IDEA. The "label" is the wrong focus in this case, since J.V.'s hearing impairment was not overlooked, and because his hearing impairment would have to be reconciled with J.V.'s intellectual disability in terms of determining the best educational placement. The Court agrees with APS that the proper focus is on "developing an appropriate education, not with coming up with a proper label with which to describe [the child's] multiple disabilities."[5] *Heather S.,* 125 F.3d at 1055.

---

[5] *See also O'Dell v. Special Sch. Dist. of St. Louis Cty.,* 503 F.Supp. 2d 1206, 1215 (E.D. Mo. 2007) (rejecting parent's claimed denial of FAPE arising from alleged erroneous label of "developmental delayed" rather than "autism," the court stated "the IEP team did not err by not specifically focusing her IEPs upon the diagnosis of autism. Instead, the IEPs properly were constructed around [the student's] educational abilities and limitations.");

**II.      Whether APS's Consideration of J.V.'s Hearing Loss meets IDEA Requirements**

Plaintiff next asserts that J.V. was denied FAPE by APS's refusal to appropriately consider the impact on J.V.'s hearing impairment on his communication and language development as required by the IDEA and New Mexico educational standards.   Plaintiff takes issue with the DPHO's COL 7, 8, 10, 11, 12, 13, 15, 18 and 19 (RP, Tab 19), all of which relate to APS's consideration of J.V.'s hearing impairment.[6]

A.      APS's Consideration of J.V.'s Hearing Loss

The record supports the DPHO's determination that APS staff is well aware of the impact of J.V.'s hearing loss, and that because J.V. has sufficient hearing for verbal communication with visual supports and other accommodations, J.V.'s hearing loss was accommodated without the use of the specific special education services that Plaintiff demands.

J.V. was identified by the school district first as a child with developmental delays and for which he received early intervention services.  Ex. BB.  J.V.'s hearing loss was identified early by the school, with the first audiology report of record completed when J.V. was 37 months old, indicating a mild hearing loss due to middle ear fluid bilaterally, and for which the audiologist recommended medical treatment.  Ex. AA at 1.  J.V. was closely followed, and in October 2001, J.V.'s doctor diagnosed persistent otitis media with effusion secondary to Down Syndrome.  Surgeries were performed on four different occasions which involved the insertion of ventilation tubes.  The degree of J.V.'s hearing loss depends on the status of his middle ear, but

_____

*Sch. Dist. of Wisconsin Dells v. Littlegeorge*, 184 F.Supp. 2d 860, 876 (W.D. Wis. 2001) ("the correctness of his label is essentially irrelevant under IDEA…the only legal question raised in this case is whether [the student] was given the proper services.")

[6]   These COL ranged from conclusions related directly to J.V.'s communication needs, *see e.g.* COL 15 (that specialized instruction were not adequate to address J.V.'s communication needs) to those which addressed more collateral matters, *see e.g.,* COL 8 & 18 (that Plaintiff had not shown it was necessary to have deaf education-related personnel at J.V.'s IEP meetings or that the school should be required to provide additional training and support to staff and parents).

has always been recognized as educationally significant by the school district's audiologists, particularly in the presence of background noise.  Exs. EE, FF, Final Decision at 7 (RP, Tab 19).

At the due process hearing, the DPHO heard testimony from both the APS audiologist who confirmed that J.V. had a "lot of usable hearing" and that J.V.'s intellectual disability is a "huge component" of his communication difficulties.   Final Decision at 15-16 (RP, Tab 19). J.V. was diagnosed with a mild conductive hearing loss due to fluid in his middle ear when he was 3 years old, and has received audiology services continuously from APS.   Ex. AA, Deft's Ex. A, ¶ 2.  As noted by the DPHO, a speech reception threshold of 20 decibels ("dB") or less is considered normal hearing; severe hearing loss would exhibit a speech reception threshold of 75 of 80 dB.   Audiograms that were conducted on J.V. showed thresholds as low as 15 and 30 dB in the right and left ears, ranging upward to 45 and 35 dB (right and left).   The audiologist testified that with these audiogram results, J.V. would be expected to hear most of what a teacher said in a one-on-one setting with normal ISP classroom background noise.

The DPHO also heard testimony by the school district's diagnostician who had administered the standard tests to J.V. and optimized the listening environment for him.   The diagnostician "firmly believed" that J.V. understood what was being asked of him as long as the question was within his cognitive ability to understand.  Final Decision at 16-17 (RP, Tab 19). It was noted that while J.V. would be able to correctly answer the first few questions in a series, J.V. could not provide the correct responses, as the questions became progressively more abstract and difficult.   The diagnostician concluded that J.V.'s communication skills "are a direct result of his intellectual disability."   Final Decision at 17 (RP, Tab 19).   Plaintiff contends that the DPHO erroneously adopted the APS "belief system," (Doc. 24 at 16) but never offers any legal basis as to why the DPHO's conclusions are incorrect, other than to disagree with the opinions of

the witnesses who testified at the hearing.  For example, Plaintiff attempts to undercut the qualifications of the diagnostician, on whose testimony the DPHO relied, by noting that he had no background or training concerning children with hearing impairment—entirely ignoring any and all of the qualifications he *did* have.  The DPHO, however, did consider this witness's qualifications, among them being that he "began his career in education with the district thirty years ago as a special education teacher teaching all levels from the most severe with multiple needs to gifted"; that he also held the position as special education coordinator in the school district, then became a diagnostician in 1993 after acquiring his license; and that he has since worked for the district in that capacity.   The DPHO found this witness to be "knowledgeable and credible."   Final Decision at 16 (RP, Tab 19).

J.V. receives speech therapy to address his communication needs (Ex. A, ¶ 3, including descriptions in IEP's, e.g., Exs. JJ, LL & NN).  Based on the opinions of the district's speech and language pathology ("SLP") liason and the district's audiologist, J.V. has sufficient residual hearing for verbal communication with visual supports and other accommodations.  Ex. A, ¶ 12: e.g., Tr. vol. I at 205-206 ("This is a student that is hearing.  He's got usable hearing.  So language is happening."); Tr. vol. II at 642-644 ("He has a hearing impairment, but he has a lot of hearing. . . He has a lot of usable hearing"); Ex. A, ¶ 12:  Tr. vol. V at 1334 ("[J.V.] has a significant of usable hearing . . . ."); Ex. A, ¶ 16 (testimony and evidence that J.V.'s receptive language skills were consistently measured to be either greater than or at least equal to his expressive language skills, indicating J.V. heard well enough to understand language).  In an effort to accommodate J.V.'s difficulties hearing normal conversational level speech, especially in the presence of background noise, such as occurs in a classroom, services were provided to J.V. based on APS's identification and evaluation of his hearing impairment.   J.V.'s teachers

and speech therapists testified that they know of his hearing loss and accommodated for it by: providing a small class size; offer 1 to 1 and close proximity instruction; ensuring that J.V. is listening to them when they were speaking; waiting for loud interruptions such as bell schedules and noisy hallways to subside before providing instruction; providing basic sign support; providing other visual supports, modeling and hands-on instruction.  Deft's Ex. A, ¶15.

APS's education plan and services for J.V. has included a multi-modal communication system consisting of oral/aural language with visual supports, including signs, gestures, and picture symbols, together with accommodations to provide an optimum listening environment through both auditory and visual channels.    Ex. A, ¶ 14; Final Decision at 7 (RP, Tab 19).[7] APS also refers to this method as the "total communication method" which includes both verbal as well as sign language gestures.  Ex. HH (description including "words, basic sign, picture communication symbols, simple voice output communication aid" to increase J.V.'s participation and effective communication).

B.    Student's Progress Under Services and Placement

Plaintiff claims that other accommodations would have served J.V. better, but these claims are not supported by evidence or testimony.   The DPHO found that the preponderance of the evidence on record "suggests [J.V.'s] communication skills are primarily, if not wholly, the result of his intellectual disability."  Final Decision at 3 (RP, Tab 19).   The DPHO concluded that, based on the record, J.V. was making progress under the individualized programming APS developed for him.  The Court finds that the record supports the DPHO's conclusion.  *See, e.g.,* Tr. vol. V at 1515 (SLP liason testimony J.V.'s language is expected to develop at the pace of his

---

[7]   Defendant's Exhibit A consists of 57 paragraphs. Each paragraph contains numerous citations to the Record Proper, including references to the parties' exhibits at the due process hearing as well as to deposition testimony. The paragraphs are further grouped into issue areas, such as APS's use of the FM system, J.V.'s progress under the IEP.

cognitive level); Tr., vol. IV at 1093-1094 (diagnostician's testimony that J.V. was able to understand what was being asked of him as long as the question was within his cognitive ability to understand . . . "[t]hen he reached the point where he understood no more"); Tr. vol. I at 209 (SLP liason's testimony of improvement in sentence structure and use of symbols); Tr. vol. II at 528-529 (Manzano ISP teacher Dan Rooney stating that J.V. made progress in life-skills activities with less prompting); Tr. vol. III at 801-802 (Manzano ISP teacher Kelly Williams stating that J.V.'s language skills improved by end of school year to include lengths of "utterance"; additions of color and verbs in sentence structure); Tr. vol. IV at 1177-1179 (testimony by SLP teacher Dana Bowersock-Ziegler at Hayes that J.V. was making progress with describing sequencing activities using pictures, sign language and verbal communication "without a lot of cueing and prompting");  Tr. vol. IV at 963 (testimony by adaptive PE teacher that J.V. was making "small, slow, steady progress"); Tr. vol. V at 1451-1452 (testimony by Richard Gellar, ISP at Manzano that J.V. made "a lot of progress" on time he took to complete tasks, following directions, increase on willingness to try new activities, decrease of "behaviors of resistance"; use of iPad for communication; ability to work independently with life skills and using touch screen on computer); Ex. JJ at 14 ("progressing," "more cooperative; "participation level has increased without constant prompts to stay busy").

Plaintiff offers the testimony of her expert, Dr. Laura Standley, in order to support her position that J.V. should have been labeled "hearing impaired" and placed in a program where he would be immersed in ASL.  Dr. Standley, who testified at the due process hearing, holds a Bachelor's degree in deaf education and Master's degree in linguistics.   Her fields of concentration were second language acquisition and English language literacy, and her language of concentration was ASL.  Tr. Vol. III at 657.  The main premise of Dr. Standley's testimony

was that even if J.V.'s communication deficits are due to his intellectual disability, those deficits might not interfere with his acquisition of language through a visual channel.  She opined that J.V. needed "strong . ... consistent, sign language exposure."  Tr. vol. III at 731:20-23.  She stated that it was "worth trying" to place J.V. in a learning environment where he would be "receiving clear and consistent linguistic input" through ASL so that he would be taught communication through his visual channel only.  Tr. Vol. III at 697:1-6.  Tr. Vol. III at 710:3-4; 739; 17-22.  She did, however, express a concern that J.V. could possibly be "overwhelmed" if placed in a classroom environment where ASL was the only mode of communication.  Tr. vol. III at 704:3-12.

The Court agrees with Defendant that Dr. Standley's opinion on what immersion in ASL would have done to improve J.V.'s language development is conjecture and speculation by an expert witness.  The DPHO considered Dr. Standley's testimony along with all the other testimony presented, and in the end found that it "did not overcome the extensive evidence that the education program currently in place for [J.V.] is appropriate."  *Id.*  Final Decision at 19 (RP, Tab 19).  The DPHO noted, and the Court finds it significant, that Dr. Standley's opinion was based on her review of J.V.'s education records.  She had not met J.V., nor performed an independent evaluation of him.  Tr. vol. III at 729:7-14.  On the other hand, in addition to Dr. Standley's testimony, the DPHO heard a considerable amount of testimony of those teachers and evaluators who were familiar with J.V. on a consistent basis and who had monitored his progress along the way.  She weighed that testimony and considered the other evidence presented concerning the educational services J.V. was receiving to accommodate his hearing loss and his intellectual disability.  The DPHO deferred to the testimony of the district's special education director who, based on his professional expertise and having heard the testimony at the hearing,

16

expressed the opinion that the "total communication" approach was best for J.V.   Tr. vol. V at

1334.   The special education director believed that immersing J.V. in ASL would be a

"disservice" to him "because it would cut off the auditory channel for his accessing information"

and that the best approach was one that presented language "verbally supported with some sign

and using pictures."  *Id.* at 1335.

The Court finds that Plaintiff has not presented any basis to reverse the DPHO's

conclusions on these issues, based on the testimony and evidence presented at the due process

hearing.   J.V.'s hearing impairment was adequately considered for purposes of the IDEA, based

on the Court's independent review of the record.  Any failure on the part of APS to label J.V. as

"hearing impaired" amounts to, at most, a procedural violation of the IDEA that does not warrant

relief.  *See O-Toole v. Olathe District Sch. Unified Sch. District No. 233,* 144 F.3d 692, 701

(10th Cir. 1998).  The record contains substantial evidence that APS properly evaluated J.V. and

although J.V. was not labeled "hearing impaired," J.V.'s hearing loss was properly identified and

accommodated under the IDEA.

B.     Use of State IEP Addendum Form

Plaintiff also argues that J.V. was denied a FAPE by APS's refusal to appropriately

consider the impact of his hearing impairment on his communication and language development

under New Mexico educational standards because APS failed to use a specific addendum form

("Addendum") when APS developed J.V.'s IEP.   The form was created by the New Mexico

Public Education Department ("NMPED") in 2009 in an effort to implement IDEA into the

delivery of public education to hearing impaired students.

The IDEA allows states to adopt higher standards for delivery of education that the IDEA

requires, *see* 20 U.S.C. §1401(B) (defining FAPE in part as providing an education and related

services that "meet the standards of the state educational agencies").   Plaintiff asserts that APS was required to use the Addendum form under New Mexico's "Deaf and Hard of Hearing Children's Education Bill of Rights," which calls for "a communication-driven and language driven educational delivery system in New Mexico for children who are deaf or hard-of-hearing."  NMSA §28-11C-2(B) (2004).   Instead of using the Addendum, *see* Ex. 33, APS uses what Plaintiff describes as a less complete form, which is captioned as "Considerations for a Student Who is Deaf or Hard of Hearing," and which Plaintiff contends does not adequately explain the federal requirements or sufficiently track the information that the IEP must consider. (Ex. WW at 23).   Plaintiff claims that use of this form was intended to be mandatory for all LEA's and that failure to use the Addendum when developing J.V.'s IEP's violates the IDEA's requirement that educational and related services follow the state's standards for education the deaf and hearing impaired.   *See 2*0 U.S.C. §1401(8); 34 C.F.R. § 300.13.

The Court disagrees with this argument because there is no basis to find that use of this Addendum form is binding on APS.   The New Mexico statute on which Plaintiff relies does not suggest that use of the form is mandatory:

> Since 20 U.S.C. § 1414(d)(3)(B)(iv) of the federal Individuals with Disabilities Education Act requires that the individual education plan team consider the unique communication needs of children who are deaf or hard-of-hearing, the public education department shall develop a model "communication consideration for students who are deaf or hard-of-hearing," to become part of the individual education plan process. **The model shall be disseminated to all local school districts, with training to be provided as determined by the department**.

NMSA §28-11C-3(B).   The language in the New Mexico statute requires that the form be disseminated and that communication considerations become part of the individual education plan process, but it does not require that this particular form be used instead of another form APS may be using to accomplish the same objective, which §28-11C describes as a consideration of

the "unique communication needs" of deaf and hearing impaired students.  *See* NMSA §28-11C-2(A)(3)(b); 20 U.S.C. §1414 (d)(3)(B)(iv).

The form used by APS ("Considerations for a Student Who is Deaf or Hard of Hearing") considered J.V.'s academic level, his primary language and/or communication mode, opportunities for direct communication with peers and professional personnel in the child's language and communication mode.   It was determined that the following supports were necessary in order to meet J.V.'s IEP goals and objectives: an "as needed" FM system, visual supports, preferential seating, repetition and frequent checks for comprehension.  Ex. WW at 23. The Addendum created by NMPED incorporates the same factors as those included in the APS form.   Ex. 33.   At its core, the Addendum is basically a deconstruction of the APS form, except that it takes up more pages by using larger font type and taking up more space with the use of tables.

Plaintiff militates for form over substance.   There is no legal basis to Plaintiff's argument that APS must use this Addendum form in order to meet either state standards, or the standards under the IDEA.   The Court concludes that even though J.V. was not categorized as a "hearing impaired" student under the IDEA, APS has considered his hearing loss, under both the IDEA and state standards, and that the form APS used to consider the needs to accommodate J.V.'s hearing loss is consistent with state standards as well as those under the IDEA.

**III.     Whether the Specific Accommodations Plaintiff Prefers (Use of FM System and ASL) Are Necessary to Provide FAPE to J.V.[8]**

---

[8]   The FM system is an assistive technology device used to amplify sound.   It consists of a headset, worn by a student, and microphone which is worn by the teacher.   The IDEA considers an FM system to be an audiological related service.   See 34 C.F.R. §300.5 (assistive technology device definition).

Plaintiff contends that J.V. was denied a FAPE by APS' refusal to meet his language and communication needs by (a) failing to implement consist use of the FM system required to allow him to hear in the classroom, and (b) failing to instruct and immerse J.V. in ASL.

A.    FM System

Plaintiff contends that APS's use of the FM system (also referred to as "FM trainer") was haphazard, discretionary and inconsistent and that APS denied J.V. a FAPE by refusing to consistently use the FM system required to allow him to hear in the classroom.   Plaintiff claims that the APS audiologist recommended the FM system, but APS did not make use of it until March 2011 because one of J.V.'s teachers had determined that the system should not be used because of J.V.'s activity level.  Tr. vol II at 603-603.

An APS audiologist explained the purpose of the FM system:

[I]t improves the signal-to-noise ratio, so that the student can hear the teacher's voice louder in the presence of background noise. So the teacher's voice or the instructor's voice would go directly into the student's ear, and things such as distance from the listener, background noise, were less of an issue.

TR vol. II at 564.    The audiologist summarized J.V.'s hearing as being "educationally significant."  Ex. 7.   Plaintiff contends that, despite the audiologist's recommendation that J.V. use the FM system, J.V.'s teachers overruled the audiologist and decided for themselves that either the system was too cumbersome or that J.V. did not need it.   This was, as Plaintiff views it, tantamount to a violation of the IDEA because it was inexcusable to deprive J.V. of auditory access to spoken language by choosing not to use the FM system which audiology had recommended.   For support, Plaintiff relies on a District of Utah case, *M.S. ex rel. J.S. v. Utah School for the Deaf and Blind,* which found that deprivation of FAPE where a classroom teacher unilaterally decided not to provide the FM system that had been designated as part of the student's IEP plan.  2014 WL 4216027, at *8 (D.Utah, 2014).

Defendant claims that the record demonstrates that J.V.'s language deficits are a result of his cognitive deficits, and therefore inconsistent use of the FM system is not necessary to provide FAPE to J.V.   Testimony was given at the hearing which supports this contention.   *See, e.g.,* Tr. vol IV at 1093-1094 (APS diagnostician's testimony that J.V. was able to understand what was being asked of him as long as the question was within his cognitive ability to understand); Tr. vol. III at 777-778 (testimony by SLP at Manzano that J.V. had difficulty with receptive signs due to inability to understand them); Tr. vol IV at 1075 (testimony by APS diagnostician that J.V.'s "communication skills . . . are a direct result of his intellectual disability"); Tr. vol. V at 1348 (testimony by APS teacher that J.V.'s "language delays are due primarily to the intellectual disability"); Tr. vol. III at 644 (testimony by APS audiologist that J.V.'s intellectual disability "plays a huge component" in delay of oral English).   The DPHO found these witnesses to be "knowledgeable and credible."   Final Decision at 16 (RP, Tab 19); and at 12, ¶ 5; *see also* Ex. WW at 2 (Student Profile noting that J.V.'s "identified disability negatively affects grade level academic progress in areas of phonics/reading comprehension . . . auditory processing/visual processing/receptive language/expressive language. . . .").

APS also contends that a student with a hearing loss is not necessarily entitled to all services or accommodations that are available to students with that particular disability.   Rather, the student must also *need* special education and related services as a result of that disability.   34 C.F.R. §300.8(a)(1).    In this case, J.V.'s educational needs were met, since progress was indicated in a number of areas.   The DPHO found, based on based on testimony and progress reports admitted into evidence, that J.V. "made more than di minimis progress toward his IEP goals during the statutory period."    Final Decision at 12, ¶ 10; *see* Ex. JJ at 14 & 23 ("progressing" and "more cooperative"); Ex. NN at 4; Tr. vol. V at 1451-1454 (testimony by

vocational teacher of progress by J.V. in communicating what  he needed, and less resistant to work activities that he was being asked to do).

The Court's review of the record indicates that the DPHO's conclusions were correct. The DPHO was cautious and careful in her findings on J.V.'s progress.  She considered testimony that J.V. was improving in verbalization and interaction, but also considered reports that his signing was "inconsistent and frequently inaccurate," and that his speech intelligibility was "variable" and "typically less than 50% intelligible in known context."  Final Decision at 10 (RP, Tab 19); *see also id.* (noting that J.V. showed some progress in copying down his phone number, but not in memorizing it, and citing to Tr. vol I at 109).   The Court's conclusions on J.V.'s progress are consistent with those made by the DPHO.  While J.V. showed some progress, it was more than de minimis—although not much more, and very slow going.  *See* Ex. WW at 2 (noting "minimal gains on academic sight words this past year"); *see also* Ex. NN at 37 (J.V. "continues to show regression in all academic areas and requires continual instruction to maintain skills due to his multiple disabilities").   J.V. was not denied a FAPE because he showed some progress.  *See Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (holding that a school's failure to provide all the services and modifications outlined in an IEP does not constitute a per se violation of the IDEA); *CJN v. Minneapolis Public Schools*, 323 F.3d 630, 638 (8th Cir. 2003) (academic progress is an "important factor" in ascertaining whether a disabled student's IEP was reasonably calculated to provide educational benefit) (citing *Rowley*, 458 U.S. at 202).

Plaintiff argues that APS denied J.V. FAPE because the FM system was not used consistently.  However, none of the evaluations that were completed ever required continual use of the FM while J.V. was in school.  *See* Ex. JJ at 3, 2011 IIEP (J.V. "should receive preferential

seating in the classroom . . . [and would] benefit from using an FM/Auditory Trainer in the classroom, *when appropriate during instruction*"); *Id.* at 4 (recommending use of FM system "*[w]hen appropriate*"); Ex. NN at 38, 2012 IEP ("([J.V.] "will continue Audiology services 3 hours per year); Ex. WW at 23, 2013 IEP("the FM system will be used to support instruction and communication *as needed*").   Also, as Defendant notes, the facts underlying J.V.'s situation are different from the facts in the case relied on by Plaintiff, *M.S. ex rel. J.S. v. Utah School for the Deaf*.  In that case, the student's IEP called for an FM system to be used "in the classroom to assist [student] in compensating on her hearing loss," but during the following school year, the student's teacher unilaterally decided not to use the FM system with her at all.  2014 WL 4216027, at *8.

        The facts in the instant case are easily distinguishable.  J.V.'s IEP's recommended use of the FM system as needed and when appropriate.   Also, while the FM system was not used continually, there is no evidence of a unilateral decision by any APS staff *not* to use the system.  At times, J.V. would refuse to wear it.  Tr. vol. V at 1496:21-22; Ex. WW at 3 (noting that J.V. has use of the FM system but "rarely uses it"); Tr. vol. V at 1500:13-17 (In Mr. Gellar's class, J.V. would not choose to wear the FM system unless he was asked to use it).   In other situations, the FM system was not appropriate or helpful, and so was not used.   *See* Ex. P at 2 (J.V. using FM system "more consistently"); Ex. P at 30 (FM system "[u]sed in class for individual work but for group work, the FM is a distraction; at 71 (FM working well, used with individual work in classroom); Tr. vol. II at 593-594 (testimony by ISP teacher that when FM system, it was important to make sure teacher had J.V.'s attention and that he was in close proximity speaking face-to-face); Tr. vol. II at 526-527 (J.V. did not wear the FM system during cooking classes

when students were "moving around and cooking," and not sitting); *cmp.* Tr. vol. III at 883:12-24 (using FM system when a DVD is playing is a "great way" to use the system).

Dan Rooney, one of J.V.'s ISP teachers at Manzano, testified that he used the FM system "very infrequently" because he ran into "difficulties" when using it.  Tr. vol. I at 42:21-25.   Mr. Rooney discovered that the system did not work well in an ISP classroom where there was considerable movement because a student using the FM system would also pick up instructions or communications from the teacher to some other student in the classroom.   *Id.* at 43-44.   Use of the FM system then became difficult because a teacher would have to turn the system off or take if off every time the teacher needed to talk to another student.  *Id.* at 44:1-12.  As a result, Mr. Rooney felt that the FM system was more suitable for a classroom "where students sat in one place at one time with one kid all the time," *id.* at 43:6-10, and that it was not a system "set up for an ISP program."   *Id.* at 44:17-24.    He felt that in such situations, giving J.V. specific directions one-on-one worked better.  *Id.* at 44:1-7.

Plaintiff takes issue with J.V.'s teachers deciding on their own not to use the FM system, contradicting the recommendations of APS audiologists.  However, the record indicates that APS audiologists were aware of situations where J.V.'s teachers opted not to use the system, but supported the teachers' decisions on those occasions.    One APS audiologist, Ms. Virginia Sedlacek, testified that she was aware of times when teachers discouraged use of the FM system because of J.V.'s activity levels.  Tr. vol. II at 603-604.  Even though it was the teacher's recommendation—and not the audiologist's—not to use the system, Ms. Sedlacek felt that where the FM system would not work for the student, the next best option was to "[c]ontinue with the other accommodations."  *Id.* at 604:1-4.   Ms. Sedlacek also stated that the APS audiologists

"appreciate" the teachers' input because a teacher "typically knows the student on a more day-to-day basis than the audiologist does." *Id.* at 604:8-10.

The record indicates that use of the FM system was not, as Plaintiff asserts, "haphazard." While use of the system was at times inconsistent or discretionary, it was neither arbitrary nor unilateral and it was in line with the recommendations concerning the accommodations that had been identified as helpful and appropriate under J.V.'s IEP's, including the FM system. Teachers used their discretion to determine when the FM system was needed or appropriate in order to create a more effective learning environment. *See also* Tr. vol. III at 843 (using all available accommodations to create an "optimum listening environment" for J.V. when not using the FM system, for example, going to a different room that was quieter in order to allow minimal distraction and increase face-to-face interactions); Ex. NN (J.V. could be expected to hear his teachers' instructions under "quiet listening conditions"); Ex. 23 (listing FM system as one of the "supports" listed to meet IEP objectives). Therefore, APS's use of the FM system "when needed" and *not* using it when its use was counter-productive, was not a denial of a FAPE or a violation of the IDEA.

B.    Use of ASL

Plaintiff insists that J.V. was denied FAPE by APS's failure and refusal to provide him with a classroom environment where he could be immersed in and taught ASL. Defendant again points out that ASL instruction would not rectify J.V.'s language delays which were due most likely to his cognitive deficits.

The Court has already covered much of this issue when discussing whether APS considered J.V.'s hearing impairment and the reasons ASL instruction and immersion was not selected as an educational service for J.V. The DPHO's listened to all the available testimony

25

and evidence and in the end, agreed with APS's determination that placement for J.V. in a program that used ASL as a primary communication mode was not appropriate. *See* Defts' Ex. A, ¶ 11. The Court's review of the evidence leads to the same conclusions. There was testimony and evidence that J.V. has usable hearing and that immersing him in ASL would cut off the auditory channel as a way for him to access information. Tr. vol. V at 1335. Dr. Standley, Plaintiff's expert, testified that she thought ASL immersion was "worth trying" with J.V., but she had never met J.V. but offered no evidence to minimize the "extensive evidence" that "total communication" was the best approach for J.V., and that the education program currently in place for J.V. is appropriate. Final Decision at 19 (RP, Tab 19).

There was also testimony at the hearing by Angela Coutts, Assistant Principal of Del Norte High School, that students have different levels of fluency in ASL, but students in that program actually learn through ASL as their primary mode of communication.[9] This means that the teachers use sign language when the "student gets stuck. . . ." Tr. vol. IV at 1245-1246. Fluency in ASL is "commensurate with [a student's] language abilities." *Id.* at 1245:20-23. Ms. Coutts explained that in the deaf/hearing impaired program, ASL is used as the mode of instruction in order to teach English or grammar. Tr. vol. IV at 1250-1251 ("They're not teaching them ASL. They're teaching them via, through, that mode"). Unless a student is "pretty fluent in sign," that student would not be able to rely on sign language interpretation because understanding a sign language interpreter "requires a certain amount of metacognitive skill." Tr. vol. V at 1263-1264. This information is relevant to J.V.'s placement because J.V. still has usable hearing and ASL was never his primary mode of communication. In his case, he would not be using ASL to learn—he would simply be learning ASL. He would still be dealing

---

[9]   Del Norte High School offers a special program for deaf and hearing impaired students. Tr. vol. VI at 1224-1225.

with cognitive deficits which, based on considerable evidence in the record, pose a significant barrier to his development of language and communication.

The Court finds that the DPHO was correct in her conclusions that Plaintiff had not proven by a preponderance of the evidence that deaf education instruction was appropriate to address J.V.s individual needs and that that the instruction and accommodations the school incorporated into J.V.'s program and into the IEP's were not adequate or appropriate (COL ¶¶ 12, 13, 15, Final Decision at 21, RP at Tab 19).   Therefore, the DPHO's conclusions in the Final Decision shall be upheld.

## CONCLUSION

The IDEA offers a student a "basic floor of opportunity" to access meaningful education to students. *Rowley,* 458 U.S. 176, 201 (1982); *Systema v. Academy Sch. Dist. No. 20*, 538 F.3d 1306 (10th Cir. 2008).  This does not necessarily mean that a school district is required to offer and implement the particular program and services preferred by the parent.  Here, the parent's preferences do not coincide with IDEA requirements for J.V.

Based on the Court's review of the DPHO's conclusions and the Court's independent review of the administrative record which served as the basis for those conclusions, the Court finds that the DPHO's conclusions regarding the appropriateness of APS's services and educational placement are not erroneous, and shall not be reversed.   Accordingly, the Court upholds the Due Process Hearing Officer's Final Decision on all IDEA matters.  Accordingly, Plaintiff's appeal is **DENIED.**

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE

27